Opinion filed October 25, 2007











 
 
  
 
 







 
 
  
 
 




Opinion filed October 25,
2007

 

 

 

 

 

 

                                                                        In The                   

  Eleventh Court of
Appeals

                                                                   __________

 

                                                          No. 11-05-00335-CR 

                                             _________

 

                            EDWARD ELLIS WELLS, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                 On
Appeal from the 142nd Judicial District Court 

 

                                                        Midland
County, Texas

 

                                                 Trial
Court Cause No. CR29261

                                                                                                                                                            



 

       O
P I N I O N

 

Edward
Ellis Wells was indicted on four counts of aggravated sexual assault of a
child.  The jury found him guilty on all counts and assessed his punishment at
fifty years confinement in the Texas Department of Criminal Justice,
Institutional Division, for each count.[1]  We affirm. 

I.
Background Facts 








The
victim was Wells=s
stepdaughter.  She was twenty-six years old at the time of trial, but testified
that Wells began abusing her at age nine and continued until she was thirteen. 
The first episode occurred one night in 1988.  She got out of bed and asked her
mom, Lou Ann Wells, if she could go to bed with her.  Lou Ann said yes, told
her to go on to bed, and said that she would be there later.  Wells was already
in bed.  When the victim got into bed, he started feeling between her legs and
stuck his finger into her vagina.  Subsequent episodes involved similar
physical contact and oral sex.  On one occasion, Wells purchased a vibrator and
made the victim use it while he watched. 

Several
days after the original episode, the victim complained to her mother about the
incident.  Lou Ann confronted Wells.  He admitted that he had touched the
victim=s vagina but
claimed that he thought it was Lou Ann coming to bed.  Lou Ann made Wells leave
the house but allowed him to return after a day.

Then
in 1992, when the victim was thirteen, Child Protective Services received a
complaint concerning Wells and commenced an investigation.  Lou Ann had been
recently told by her sister and by a friend who had lived with them for two
months that Wells was still engaged in inappropriate behavior with the victim. 
Lou Ann asked the victim if Wells had touched her again and was told yes.  Lou
Ann confronted Wells at work.  He admitted that the victim=s allegations were true.  Lou
Ann was worried about her finances and about the effect the investigation might
have on the family.  So, she lied to the CPS investigator by saying that she
did not know anything about the allegations of wrongdoing.  She told the victim
to do the same.  The victim told the investigator that Wells had walked in on
her once while taking a shower but did not claim any other abuse.  Wells told
the investigator that he had accidently touched the victim=s vagina years earlier when
he thought she was his wife but denied any other wrongdoing.  CPS completed its
investigation.  The case was not referred to the district attorney or local
police for prosecution.

Wells
and Lou Ann were divorced in 1998.  He married Melanie Wells in 2000.  In 2003,
the victim contacted CPS, and it conducted a second investigation.  Wells was
interviewed, and he again admitted to the 1988 bedtime incident, but maintained
that it was an accident.  CPS scheduled a hearing.  Wells did not appear, but the
record is unclear if he was served.  Wells and Melanie lived in Texarkana when
CPS started its second investigation, but they moved prior to the hearing. 
When no one appeared at the hearing, CPS closed its investigation.  The Midland
Police Department  subsequently obtained CPS investigatory materials, and Wells
was indicted for four counts of aggravated sexual assault of a child.








II.
Issues on Appeal 

Wells
brings two issues on appeal.  First, he contends that the trial court violated
the Confrontation Clause by admitting CPS records containing testimonial
statements.  Second, he contends that the trial court erred in refusing to give
a contemporaneous limiting instruction regarding extraneous offenses. 

III.
Confrontation Clause 

Wells
argues that the trial court erred by admitting CPS records containing
statements from a witness that he was not given the opportunity to
cross-examine.  The State offered records from the 1992 CPS investigation under
the business records exception to the hearsay rule.  These records included an
intake form that indicated that an unnamed Acollateral@ person, who had lived with
Wells the last few months, reported that Wells had watched the victim shower
and dress, had inappropriately touched the victim, and had made inappropriate
comments.

A. 
Crawford.

The
United States Constitution provides a right in both federal and state
prosecutions to confront and cross-examine adverse witnesses.   Pointer v.
Texas, 380 U.S. 400 (1965).[2]   The United
States Supreme Court has held that the Confrontation Clause bars the admission
of testimonial statements of a witness who did not appear at trial unless he
was unavailable and the defendant was provided an opportunity to cross-examine
him. Crawford v. Washington, 541 U.S. 36, 53-54 (2004).  The threshold
question when a Confrontation Clause objection is raised is whether the
evidence is testimonial or non-testimonial.  This is a question of law that we
review de novo.  Wall v. State, 184 S.W.3d 730, 742 (Tex. Crim. App.
2006).








            The
Supreme Court has not provided a comprehensive definition of testimonial
evidence.  It has, however, stated that the Confrontation Clause applies to
those who Abear
testimony,@ which is A a solemn declaration or
affirmation made for the purpose of establishing or proving some fact.@  Crawford, 541 U.S.
at 51.  Additionally, the Supreme Court offered three formulations to
demonstrate the core class of Atestimonial@ statements:  (1) ex parte
in‑court testimony or its functional equivalent B that is, material such as affidavits,
custodial examinations, prior testimony that the defendant was unable to cross‑examine,
or similar pretrial statements that the declarant would reasonably expect to be
used in prosecution; (2) extrajudicial statements contained in formalized
testimonial materials, such as affidavits, depositions, prior testimony, or
confessions; and (3) statements that were made under circumstances that would
lead an objective witness reasonably to believe that the statement would be
available for use at a later trial.  Id. at 51‑52.

            The
Supreme Court again addressed the Confrontation Clause in Davis v.
Washington, ___ U.S. ___, 126 S.Ct. 2266 (2006).  Davis involved a
recorded phone conversation between a 911 emergency operator and a domestic
abuse victim.  The Court held that the victim=s
statements were not testimonial because she was not acting as a witness.  Her
statements detailed events as they were actually happening B as opposed to describing
past events;  she was seeking help against a bona fide physical threat, and her
statements were necessary to resolve the present emergency.  Id. at
2276.   The Court stated:

Statements are
nontestimonial when made in the course of police interrogation under
circumstances objectively indicating that the primary purpose of the
interrogation is to enable police assistance to meet an ongoing emergency. 
They are testimonial when the circumstances objectively indicate that there is
no such ongoing emergency, and that the primary purpose of the interrogation is
to establish or prove past events potentially relevant to later criminal prosecution.

 

 Id. at
2273-74.  In this same opinion, the Court also considered a related case
involving statements made by a domestic assault victim to police officers
responding to a 911 call.  The police arrived, secured the scene, and separated
the victim and alleged assailant.  One of the officers then interviewed the
victim and had her prepare an affidavit.  The victim did not appear at trial. 
The investigating officer was allowed to describe the victim=s comments at the scene and
to authenticate the victim=s
affidavit.  Id. at 2272.  The Supreme Court held that the victim=s statements were
testimonial because they were made during a police investigation and because
they described what had happened as opposed to what was
happening.  Id. at 2278.

B. 
Are the Collateral Source=s
Statements Testimonial?








The
record provides scant detail of the1992 conversation between CPS and the
collateral source.  We do not know the setting of that conversation:  whether
the collateral source contacted CPS directly or was referred to CPS, and if so,
by whom; the collateral source=s
sophistication or maturity; or whether the information was volunteered or
secured through questioning.  We also do not know what the collateral source
expected CPS to do with this information.  However, we do know that the
collateral source described criminal behavior that had already occurred.  This
is significant because, as the Supreme Court noted in Davis, statements
describing past criminal events are inherently testimonial since this mimics
what a witness does on direct examination.  Id. at 2278.  Davis
would, therefore, seemingly indicate that the collateral source=s allegations were
testimonial, but both Crawford and Davis involved statements to
police officers,[3] and the
Supreme Court has specifically reserved for future determination whether and
when statements made to someone other than a law enforcement official are
testimonial.  126 S.Ct. at 2274 n.2.  

Texas
courts have not adopted a definitive rule for the application of the
Confrontation Clause beyond statements to law enforcement officials but have
instead resolved this issue on a case-by-case basis.  For example, the Fort
Worth Court analyzed Crawford and Davis in the context of a CPS
investigation and found that a video recording of the child victim was
testimonial.  See Rangel v. State, 199 S.W.3d 523, 534-35 (Tex.
App.CFort Worth 2006,
pet. granted).  Conversely, the Texarkana Court held that statements made by
young children to a licensed counselor were not testimonial because the
counselor was not acting as a police officer and the counseling sessions were
not the functional equivalent of a police interrogation.  See Lollis v.
State, No. 06-06-00199-CR, 2007 WL 2274925 (Tex. App.CTexarkana Aug. 10, 2007, no
pet. h.).

CPS
has broad investigatory authority and responsibility over allegations of abuse
committed against a child by their parent or caretaker,[4]
and it is statutorily required to investigate anonymous reports of child abuse.[5] 
Whether the collateral source subjectively appreciated this, the record does
not disclose, but knowledge of the law is imputed.  Parker v. Cumming,
216 S.W.3d 905, 910 (Tex. App.CEastland
2007, pet. denied).  

In
Lollis, the court noted that, when statements are made outside police
interrogations, they are testimonial when a forensic or investigatory motive
predominates but are nontestimonial when a therapeutic or healing motive
predominates.  2007 WL 2274925, at *2.  In that case, the declarant=s statements to a counselor
were not testimonial, in part, because they had a therapeutic component.  In
this case, the record contains no indication that the collateral source=s report served any purpose
other than an investigatory or forensic role.  








Because
the collateral source was reporting past criminal behavior by Wells to an
organization statutorily required to investigate such complaints and because
the record contains no evidence that the contact served anything other than an
investigative purpose, we find that the statements were testimonial.  By this
we do not hold that all third-party contact with CPS implicates the
Confrontation Clause, merely that the collateral source=s allegations in this case were testimonial. 
Because the allegations were testimonial and because Wells did not have the
opportunity to cross-examine the collateral source, the trial court erred by
admitting the 1992 CPS intake form.

C. 
Was the Error Harmful?

A
violation of a defendant=s 
right of confrontation is subject to a harmless-error analysis.  Delaware v.
Van Arsdall, 475 U.S. 673, 684 (1986).  We must reverse the judgment of
conviction unless we determine beyond a reasonable doubt that the error did not
contribute to the conviction.  Tex. R.
App. P. 44.2(a).  The Texas Court of Criminal Appeals has recently
observed that, when performing a harmless-error review in a Confrontation
Clause case, the following factors are relevant:  

1. 
the importance of the out-of-court statement to the State=s case;

 

2. 
whether the out-of-court statement was cumulative of other evidence;

 

3.
the presence or absence of evidence corroborating or contradicting the
out-of-court statement on material points; and

 

4.  the overall
strength of the prosecution=s
case.

 

Scott v.
State, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).  The question is not
whether the jury verdict was supported by the evidence.  The question is the
likelihood that the constitutional error was actually a contributing factor in
the jury=s
deliberations in arriving at a verdict.  Id.  We are convinced beyond a
reasonable doubt that it was not.

The
trial court did not err by allowing testimony that CPS conducted an
investigation in 1992; why that investigation was initiated; or what the
victim, Lou Ann, and Wells told the investigator.  The error was limited to the
admission of the substance of the 1992 anonymous allegation.  That allegation
played very little role in the trial.  The first reference to it came during
the State=s opening
statement.  The prosecutor told the jury:








But in October,
October the 15th of 1992, someone anonymously called Child Protective Services,
and they reported that they suspected Eddie Wells was molesting his daughter
[the victim] and a Child Protective Service worker, Corinne Rodriguez who you
will hear from, began to investigate the case.

 

The State called
Corinne Rodriguez Dickie (she had since married) as a witness, but after first
calling the victim and the victim=s
cousin. 

When
Dickie testified, the jury had already heard the victim describe several
instances in which Wells placed his finger in her vagina, performed oral sex on
her, made her use a vibrator while he watched, made her perform oral sex on
him, and made her touch his penis.  The victim=s
cousin testified that, during the summer of 1992 when she was thirteen years
old, he kissed her on the mouth and touched her breasts. 

Dickie
testified that, during the 1992 investigation, she advised Wells of the
allegations that had been made against him, and she was allowed to testify B for the limited purpose of
establishing what she told Wells and not for the truth of the matter B that:

The
allegations were regarding Mr. Wells watching [the victim] shower and watching
her dress.  And they were also regarding inappropriate remarks he would make to
[the victim].  They didn=t
make any, you know, specific remarks, but B
and also that inappropriately touching [the victim].

 

Subsequent
witnesses testified about their conversations with CPS, and the 1992 records
themselves were admitted.  However,  no other witness referenced the 1992
anonymous report.  The CPS records describe that report as follows:

Comp spoke w/ collateral who has lived w/ AP last few months.

The
OV had come to collat. in tears saying she couldn=t
deal w/ him (SFA) watching her dress and shower B
his touches were inappropriate (accord to colat.) & inappropriate comments.

 

Time
told is approx. 2 mos. ago.

 

Finally, during closing argument,
the prosecutor told the jury:

 

[T]he Child Protective
Services records are right here.  You can take them into the room with you, you
can read every single word, and you can decide if you think that  Corinne
Dickie is lying.  You can read every word that she wrote and you can decide if
she made all of that up.

 








Wells=s defensive strategy was to
challenge the victim=s
credibility.  He suggested that the victim contacted CPS in 2003 because of an
irrational reaction to a scene at the hospital when the victim=s younger sister gave birth
and several family members, including Wells, came to visit.  He pointed out
that in 1995 the victim voluntarily worked for him and was alone with him; that
during one of the alleged sexual acts the victim=s
younger sister was in the same bed but did not notice anything; and that, when
the victim talked to the CPS investigator in 1992, there was no one else
present to pressure her or otherwise prevent her from telling the truth. 
During his case-in-chief, Wells elicited testimony from several witnesses that
the victim=s
reputation for truthfulness was poor.  Finally, Wells testified on his own
behalf and denied any wrongdoing.

It
is clear that the substance of the 1992 anonymous allegation played no part in
the jury=s
deliberations.  The State=s
case and Wells=s
defense turned on the victim=s
credibility. The substance of the 1992 allegation was not material to that
determination.  The 1992 allegation was briefly and only tangentially discussed
during the testimony, the note itself was cryptic, and neither the State=s opening statement nor
closing argument repeated it.  Furthermore, the wrongdoing alleged in 1992 is
significantly different from the victim=s
allegations at trial.  We can say beyond a reasonable doubt that the 1992
anonymous allegation did not contribute to Wells=s
conviction and, therefore, that the trial court=s
error was harmless.  Issue one is overruled.

IV. Limiting
Instruction

In
Wells=s second issue,
he contends that the trial court erred by failing to give the jury a limiting
instruction regarding extraneous offenses at the time the evidence was admitted
into evidence.  When evidence that is admissible for one purpose but not for
another purpose is admitted, the court, upon request, shall restrict the
evidence to its proper scope and instruct the jury accordingly.  Tex. R. Evid. 105(a).

The
State offered evidence that Wells touched the victim=s cousin=s
breasts to show absence of mistake.  A hearing was conducted outside the
presence of the jury to determine if the evidence was relevant, extraneous, and
whether it was prejudicial.  Wells objected to the evidence arguing that its
prejudicial effect outweighed its relevancy.  The trial court allowed the
testimony.  Wells requested a limiting instruction to be given to the jury upon
admission of the evidence by stating the following: 

MR.
HEAGY:  In light of the Court=s
ruling, Your Honor, Defendant would respectfully request that the Court give a
limiting instruction on the purpose of the admissibility.  I think it=s pursuant to B

 








THE
COURT:  At this time or potentially in the charge?

 

MS.
CLINGMAN:      Thank you, Your Honor.

 

MR.
HEAGY:              I think it needs to be both.  

 

MS.
CLINGMAN:      The State believes, Your Honor, that there is no limiting
instruction that is necessary as we proffered the testimony.  In the Court=s charge would be the
appropriate place to place any type of limiting instruction. 

 

MR.
HEAGY:  Definitely then.

 

MS.
CLINGMAN:      Absolutely. Uh-huh.

 

THE
COURT:  Okay.  The Court will grant a limiting instruction to be worded in the
charge pertaining to the extraneous evidence. 

 

Wells
relies upon Rankin v. State, 974 S.W.2d 707 (Tex. Crim. App. 1996), for
the proposition that Tex. R. Evid. 105
requires the trial court to give a limiting instruction at the time the
extraneous offense evidence is offered.  However, we find that Wells did not
preserve this issue for review.  A request for a limiting instruction must
inform the trial court as to what limitations should be placed upon the
evidence.  Puente v. State, 888 S.W.2d 521, 528 (Tex. App.CSan Antonio 1994, no
pet.).  Wells did not specify what limiting instruction he wanted.  Also, when
the court stated that the limiting instruction would be included  in the charge
rather than given contemporaneously, Wells did not object.  Accordingly, Wells
did not preserve this issue for review.  We overrule Wells=s second issue on appeal. 

V.
Conclusion

We
affirm the judgment of the trial court. 

 

 

RICK STRANGE

October 25, 2007                                                                    JUSTICE

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of: Wright, C.J.,

McCall, J., and Strange, J. 









[1]Wells was represented at trial by Warren K. Heagy.  We
note with sadness that Mr. Heagy passed away shortly after this trial.  Mr.
Heagy had a long and distinguished career and will be missed by all.  





[2]AIn all criminal prosecutions, the accused shall enjoy
the right to . . . be confronted with the witnesses against him.@   U.S. Const. amend. VI. 





[3]In Davis, the Court considered the 911 operator=s actions to be those of the police for the purposes of
that opinion.  126 S.Ct. at 2274 n.2. 





[4]See Tex. Fam. Code Ann. ' 261.301 et seq. (Vernon 2002 & Supp. 2006).





[5]See Section
261.304.